DECISION
The genesis of the instant lawsuit was a petition to enforce a mechanic's lien filed by William B. Faulkner against the respondents, Charlene and Joseph DiNobile. Petitioner alleged that Mr. and Mrs. DiNobile owed him $49,000 for services and materials expended with reference to the DiNobile's South Kingstown home. Mr. and Mrs. DiNobile not only deny the debt, but assert in a counterclaim that petitioner's work was defective; that they were fraudulently induced to contract with petitioner; and, that they were forced to spend large sums to rectify petitioner's substandard work. It must be noted that the Court has been to the house for a view — inside and out — with all parties and counsel present.
The parties entered into a construction agreement on June 22, 1995 obligating Mr. Faulkner to build a home for the DiNobiles according to the contractor's specifications (Exh. 11). The purchase price, to be paid in installments, was $149,600. Mr. Faulkner also provided a general specification sheet (Exh. 10) setting forth the types and amounts of materials and items to be utilized, and providing for certain allowances. Any variances from said specifications were to be placed in writing and agreed to by all parties.
Mr. Faulkner, a life-long South County resident, started building homes under his own name in 1985. Prior to that he had gained experience in carpentry, doing framing and remodeling.
Since 1985, he has constructed 26 to 30 homes usually in the range of 1500 to 2000 square feet. With reference to the DiNobile home, Mr. Faulkner had been approached by Art Boyce of ReMax South Shore Realty, who presented Mr. Faulkner with a sketch for a proposed structure and asked for a price. Mr. Boyce balked at the estimate of $250,000 and requested a revised estimate after changing certain specifications. Among the latter alterations were the elimination of a garage, the deletion of oak for flooring, the reduction of square footage and a change in the type of siding from wood to vinyl. Realtor Boyce expressed that the lowered price, $175,000 would still be too high for his clients. Eventually the price was reduced to $149,600 as reflected in the contract.
Per Paragraph 8 of the agreement Mr. Faulkner was to commence construction "as soon as notified by Owners to do so" and to "complete same within a period not to exceed 120 days." The building permit, applied for by Mr. DiNobile, was issued on July 21, 1995. The construction to be allowed was for a 24x30 two story dwelling with attached garage.
The DiNobile lot had been surveyed in April, 1995 by Jeffrey Balch, a registered land surveyor of Frisella Engineering. After the lot was "staked", however, the orientation of the proposed structure and the location of the forms looked "funny" to both Mr. Faulkner and Mr. DiNobile. The latter then telephoned Mr. Balch who then returned to the site on August 10, 1995 and testified that [his] "mistake was very obvious." A ten-foot error necessitated the restaking of the lot and the moving of concrete forms. The remedial work was performed on August 21, 1995, costing Mr. Faulkner, according to his testimony, twelve construction days. After construction commenced, Mr. Faulkner claims that Mr. DiNobile made requests for items which went beyond the contract specifications, costing the contractor time and money. These items included an intercom system, a wall heater in the bathroom, Fagan garage doors, extra windows, designer siding, Andersen sliders, plaster in the garage, underground utility lines, angling the third floor deck for south side view to the ocean, the addition of a rubber roof over the rolled roof. Mr. Faulkner cites the total cost of extras to be $8,565.
After the windows were installed, problems of leakage occurred. Although Mr. Faulkner attempted to remedy the situation and called in a factory representative, the "cure" was nor to the homeowner's satisfaction. This, and other problems, caused the DiNobiles to engage counsel to set forth their complaints and concerns about the project.
On November 25, 1995 Mr. Faulkner was notified by Attorney Foster in a letter (Exh. 29) that no final decision had been made as to whether to terminate Mr. Faulkner. By December 1, 1995, however, that decision was made and Mr. Faulkner was literally ordered off the property and instructed not to return. (Exh. 30).
Mr. Faulkner responded on December 15, 1995 (Exh. 31) requesting payment of $47,500, which when added to the DiNobile's payment of $75,600 would represent payment up to the third advance in the disbursement schedule. The third advance was due when the following had been installed: interior door frames, well (drilled and connected), wall and floor tile, floors, sheetrock, trim work and septic tank (connected).
The live testimony of Mr. Faulkner regarding "reasonable cost to complete" the project after December 1, 1995 coincides with Exhibit 32 and need not be repeated.
The respondents assert that at the point of termination of the house shell was constructed but the interior work had not commenced. The plumbing was roughed-in, the electrical system installed and the walls insulated and plastered. The alleged deficiencies in workmanship at the point of termination involve the slab, heating system, decks, insulation, shingles, and the propane gas line.
Respondent, Joseph L. DiNobile, Jr. of Lincoln, Rhode Island, testified that he and his wife, Laura, met petitioner through realtor Art Boyce in June of 1995. Mr. DiNobile was expecting to have a "turnkey" house completed by October. Essentially, Mr. and Mrs. DiNobile were to concern themselves with the selection of color schemes.
Mr. DiNobile testified that he found the forms to be in the wrong location and notified Frisella Engineering. When the foundation was poured, Mr. DiNobile observed that lagbolts were inserted in an inappropriate fashion and that there had been no compaction of the soil. He also stated that plaintiff forgot to install the insulation under the floor, which was called for in the plans stamped by the Building Inspector. Literally, according to respondent, construction problems arose from the ground level up. As the second floor was erected, a concern developed as to how the third floor would be supported. Mr. DiNobile claims that the plaintiff stated that "once the house was finished, the third floor would hold down the second floor." After consultation with architect Laura Krekorian respondent authorized the installation of four lolly columns as support devices. Mr. DiNobile participated in the digging of 30-inch cone-shaped holes to fill with cement and imbed the columns. The house was "OK for one week" and then, it started to sink and the middle of the second floor "would split and heave." The joists were splitting, respondent testified, and pushing up the plywood in the floor. In early November it became apparent to Mr. DiNobile that the house was not weathertight. Rain would leak in through the doors, windows, sliders, and third floor ceiling. According to respondent's testimony, Mr. Faulkner "blamed the window manufacturer." There was also an issue about a 6 foot tub respondent desired which was included in the plumber's proposal and which respondent thought was in the specification sheet. Mr. Faulkner told respondent that the delayed arrival of the tub precluded him from completing the surrounding walls. When Mr. Faulkner ceased work on the structure, per Mr. DiNobile, the construction problems remaining were legion, according to respondent's testimony. In fact, a review of that testimony reveals that practically nothing was correct in the house. Windows were leaking, walls were Staining, the foundation was uneven, the floors and roof lines were uneven, the stairs were uneven, the rafters were the wrong size, shingles were blowing off the roof, the gas line was installed improperly, the deck was protruding into the bedroom. The problems, as described by Mr. DiNobile, persist to this date and include but are not limited to the following: windows leaking, gas propane pipes deteriorating, water coming in the windows, a sinkhole developing, boards on garage door peeling off, windows need replacing, garage in need of heating so boiler will not freeze, pipes have burst due to substandard work, the bedroom slider protrudes 2 to 3 inches into the room, no roof paper was applied.
Mr. DiNobile engaged the services of L. Robert Smith, the president of Waterman Engineering, to evaluate the construction and to testify as to his observations. Among other problems, he stated that: shingles were missing from the roof and shed; the shingles had been improperly nailed and were "only 20 year shingles"; the sliding glass door protruded into the bedroom; the handrail on the deck which should accept 200 pounds was "wobbly" and [the engineer] thought [he] could rip it off; ledger board was nailed in instead of being through-bolted, roof framing was not code-compliant, sash openings were not code-compliant, windows were of poor quality, many shingles had only two nails, the vinyl siding was not recommended for exposure to northeast wind-driven storms; generally, the house was not erected in a workmanlike fashion and suffered from "numerous" code violations. On cross-examination he acknowledged that the architect's plans with reference to the overhang design were flawed and could not have been prudently constructed by Mr. Faulkner.
Petitioner's expert at trial was Dana Newbrook, an architect with over 30 years of experience. Among other professional affiliations, Mr. Newbrook has served on the Rhode Island Code Standards Committee and Board of Appeals since 1995 and on the Rhode Island Board of Examiners and Registration of Architects since 1996. Mr. Newbrook reviewed the DiNobile house plans and inspected the home. He concluded that five windows at ground level were not code-compliant. The applicable code provisions, see, R 211.2, "Emergency Egress Openings" requires that all egress or rescue windows from sleeping rooms have a minimum net clear opening of 5.7 square feet. An exception is made for grade floor windows which may have a minimum net clear opening of 5 square feet. Since the installed windows have a clear opening of only 4.39 square feet, they are below code and must be replaced. The cost for this correction, including labor and materials, is $2,306.10. The other significant problem Mr. Newbrook observed was the lolly columns and footings which were not code-compliant, and in need of replacement. The footings were too shallow and not sufficiently below the frost level to carry the load properly. To remedy this, the new footings would have to be created and the columns reinstalled. The cost of this project, as detailed in Exh. 53, would be $2,300.
Mr. Newbrook then addressed in turn the other alleged defects. With reference to the improperly installed lagbolts, he testified that they were installed after Mr. Faulkner was removed from the job. The complained-of handrail attachment showed two Philips head screws per baluster, evenly spaced and adequate. The code requires sufficient strength to prevent a fall and this installation conformed.
Mr. Newbrook opined that the change from 2x12's to 2x8's was allowable, perfectly adequate with reference to load factors and code-compliant. The home is in a Zone 3 category which means it must withstand 100 miles per hour winds. Also, the load is increased here by 50% due to the height of the structure. The 2x8's at 16'' on center are (and would be even at 24'' on center) allowable. Hurricane strapping over the studs and rafters, required by the present code, was not required in 1995; thus, the house as built in 1995 was code-compliant.
The insulation, Mr. Newbrook calculated, had a value of R 32.2, which is clearly code compliant and in excess of the R-30 specification.
An issue was also raised regarding the failure of Mr. Faulkner to use iron pipe to feed the propane gas. However, the applicable code provision, M-801.2 "Piping Standards" allowed, in addition, to ductile iron pipe, copper or copper alloy tubing, and even plastic piping. Regardless of the code provisions, i.e., it is the gas company's "call" as to whether any particular installation is acceptable.
The assistant building inspector for South Kingstown, Christopher R. Fagan, also testified. He had inspected the house during construction to determine whether approval for the various phases should issue. Approval would only issue if the work performed was in compliance with the state building code. Mr. Fagan's inspection records reveal that the excavation, the slab, the trench for underground service, the electrical system, the framing, the mechanical system, the plumbing and the insulation and siding were all in compliance with code provisions and approved by his department.
The credible evidence indicates that at the time Mr. Faulkner was terminated the structure was in conformance with the building code. Mr. Fagan, whose duty is to enforce that code, was the only professional, aside from petitioner, who was in a position to observe the house in its evolving state. At the time he performed his inspections, he had had 23 years of contracting experience. In the discharge of his duties, he conducts inspections on a dally basis. He has absolutely nothing to gain by favoring any party. The Court accepts his testimony as independent and unimpeached evidence of the condition of the house when Mr. Faulkner was ejected and instructed not to return.
It must be kept in mind that this is a mechanic's lien action. The Supreme Court has held that the purpose of the mechanic's lien statute is to afford a liberal remedy to one who has contributed labor or materials towards adding to the value of another's property Respondents would have the Court believe that petitioner's efforts are practically valueless. In fact, respondent asserts in his brief that his house was in a "worse condition than if [petitioner] had done nothing."
The construction agreement requires the house to be constructed according to the building code and specifications furnished to the owners by the contractor. The agreement also requires that any alterations to those specifications be agreed upon in writing (see Paragraph VI). Petitioner claims that the contract amount he is entitled is $59,696 which he derives according to the calculations in Exhibit A to his post-trial memorandum. That sum reflects a deduction of $15,212 for cost-to-complete in scope work, as well as a deduction of $7,657 for amounts Mr. DiNobile paid directly to certain sub-contractors. The sum also incorporates "extras" ordered by the DiNobiles. With reference to those items, petitioner claims an amount of $8,565 as set forth in his brief. This must be compared to the specification sheet attached to the contract which contains some additional allowances. That sheet has handwritten in that four, instead of three, sliding glass doors are to be installed. It does not stale that the allowance is $400 per door. Therefore, the Court cannot hold that the petitioner is entitled to recover $2,251 for the excess. Also, the specification sheet allows the owner to choose the color of siding. Petitioner indicates that respondent chose a "designer" color. How is the buyer to know what a "designer' color is? If the buyer is to be limited to certain colors or to a "neutral" color (as stated in the painting specifications) he should have been notified. The Court concludes that respondent can not be fairly charged $908 for choosing a particular color; nor can he be fairly charged for the accompanying trim, $380.
Furthermore, petitioner must be responsible for the cost of remedying the non-code compliant items, i.e., the lolly columns for $2300 and the grade level windows for $2306.10.
All other issues regarding this construction can only fairly be resolved in a breach of contract action. With reference to the mechanic's lien, the petitioner is entitled to prevail according to the following calculations:
Contract Balance $74,000.00
Changes/Upgrades in specifications which are in writing and agreed as
required by the contract: NONE
Payments made by Mr. DiNobile directly to sub-contractors 18,584.77
Petitioner argues that this sum should be reduced to $7,657.63 because of extras and out of scope work. Again, there is no evidence — per petitioner's contract requirements of written changes agreed to by the parties. The only item clearly out of scope is the shed, which is totally absent from the specifications and therefore cannot be charged to petitioner.
$18,584.77 — 1,500.00 (shed) __________ 17, 084.77
$74,000.00 — 17,084.77 Amount Mr. DiNobile paid __________ 56,915.23 directly to sub-contractors
Cost to perform in-scope work at time of lockout:
$56,915.23 -15,212.00 ____________ 41,703.23
Replacement of columns $2300.00
Replacement of windows 2306.10 __________
— 4606.10 _____________ $37,097.13
Judgment shall enter for petitioner on the mechanic's lien in the amount of $37,097.13.